UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LOCAL UNION NO. 1 OF THE UNITED
ASSOCIATION OF JOURNEYMEN &
APPRENTICES OF THE PLUMBING &
PIPEFITTING INDUSTRY OF THE
UNITED STATES & CANADA, by
MICHAEL APUZZO, as Financial
Secretary-Treasurer,

                 Petitioner,

- v. -

P.A.C. HEATING, INC., d/b/a/ P.A.C.
PLUMBING, HEATING & AIR
CONDITIONING,

                 Respondent.

------------------------------------------------------------x

**OPINION & ORDER**

No. 16-cv-547 (NG) (RML)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 24 2017 ★
BROOKLYN OFFICE

**GERSHON, United States District Judge:**

Local Union No. 1 of the United Association of Journeyman and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (the "Union" or "petitioner") brings this action to confirm a labor arbitration award of February 5, 2015 in the amount of $67,500 (the "Award") against P.A.C. Plumbing, Heating & Air Conditioning ("PAC" or "respondent"). It now moves for summary judgment to confirm the award pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Respondent opposes this motion and moves for summary judgment seeking that the arbitration award be vacated. For the reasons set forth below, I grant petitioner's motion to confirm the award and deny respondent's motion to vacate it.

1

I.  **Background**

The historical facts are undisputed. The Union is a labor organization that is the exclusive bargaining agent for all journey-level plumbers and apprentices employed by employers that are members of the Association of Contracting Plumbers of New York City, Inc. (the "Association"). PAC was a member of the Association until August 29, 2012, at which time the Association terminated its membership. The Association informed the Union of PAC's termination on September 17, 2012. After receiving this notice from the Association, the Union wrote PAC on September 24, 2012 informing it that, "since you are no longer a signatory contractor with the [Association], it is necessary for you to sign the enclosed [Agreement]." Pet. Ex. E. at 9.

Central to this case are three collective bargaining agreements between the Union and the Association, which it negotiated on behalf of its members ("Agreements"). The first is referred to as the "A-Agreement," which was in effect from July 1, 2012 through June 30, 2016. The other two are referred to as the "MES Agreements." The first MES Agreement was in effect from October 1, 2010 through September 30, 2013. The second MES Agreement was in effect from October 1, 2013 through September 30, 2016.

The Agreements provide that they continue in full force and effect during their terms and that an entity wishing to abrogate any of the Agreements must notify the Association and the Union 180 days prior to the expiration date of the Agreement. PAC did not send a request to abrogate the Agreements until December 31, 2014.

Pursuant to the Agreements, disputes and controversies arising out of the Agreements are referred to an arbitration committee comprised of an equal number of members appointed by the Union and the Association. According to the Union, PAC did not comply with certain provisions of the Agreements, including its failure to: post a bond; obtain green cards on jobs performed; hire

2

only union laborers; pay fringe benefit contributions; and use the proper ratio of journeymen to helpers.

On December 16, 2014, the Union requested arbitration, and PAC was notified on January 7, 2015 that the arbitration hearing would be held on January 29, 2015. On January 9, 2015, PAC's attorney objected to the arbitration. An arbitration hearing was held on January 29, 2015, at which the Union appeared, but PAC did not.

On February 5, 2015, the arbitration committee issued its written decision (the "Decision"). It found that PAC was bound by the Agreements because it did not request to abrogate them until December of 2014. In reaching this conclusion, the committee found that, though PAC's membership in the Association had been terminated, that did not occur until after the A-Agreement went into effect. Therefore, PAC was bound by this A-Agreement and had to abrogate it if it wanted to forgo its obligations, which it did not do. As to the MES Agreements, the arbitration committee concluded that PAC never requested to abrogate the first MES Agreement, thus remaining bound, and that its failure to abrogate the first MES Agreement also caused it to be bound to the second MES Agreement. Also influencing the committee's Decision was that PAC continued to submit fringe benefit contributions to the Union throughout 2014, which, according to the committee, demonstrated PAC's intent to remain bound. Ultimately, the committee imposed a fine of $67,500 for various breaches of the Agreements, and it directed PAC to pay this fine by March 1, 2015, which PAC did not do. The Union then filed this petition to confirm the arbitration award on February 2, 2016.

## II. Discussion

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate if the movant demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "A dispute is not genuine unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shiflett v. Scores Holding Co., Inc.*, 601 Fed. Appx. 28, 29 (2d Cir. 2015) (internal quotation omitted). A court is required to "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The moving party bears the burden of proof that no genuine issues of fact exist, but, once it satisfies this initial burden, the burden then shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Rosenfeld v. Hostos Cmty. Coll.*, 554 Fed. Appx. 72, 73 (2d Cir. 2014).

### B. Parties' Positions

PAC argues that, at the time of the actions underlying the committee's award, it was not bound by any of the Agreements. According to PAC, once the Association terminated its membership on August 29, 2012, it ceased being a party to any of the Agreements. *See* Respondent's Opp. at 5. Because it was not a party to the Agreements, PAC argues, the arbitration award, which was based on PAC violating these Agreements, should be vacated. The Union contends that PAC's termination from the Association is insufficient to abrogate its responsibilities pursuant to the Agreements. Rather, the Agreements set forth specific procedures that required

4

PAC to provide 180 days' notice if it desired to abrogate. Since PAC did not provide such notice until 2014, it is the Union's position that PAC continued to be bound by the Agreements.

C.  **Arbitrability**

As a threshold issue, it must be determined if PAC was bound to arbitrate whether its termination from the Association also terminated its obligations under the Agreements. The issue of arbitrability arises when there is a question as to whether "there is even a valid agreement to arbitrate in effect at a particular time." *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72-73 (2d Cir. 1997). Here, PAC argues that there was no valid agreement to arbitrate in effect after August 29, 2012.

The question whether a valid agreement to arbitrate exists usually arises in one of two factual scenarios:

> (1) whether the parties ever entered into an arbitration agreement at all, and (2) whether an arbitration agreement has expired or been terminated. When parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, absent a clear and unmistakable delegation of that authority to an arbitrator . . . The question of whether an otherwise valid collective bargaining agreement has expired or has been terminated is different. In these situations, the parties' dispute is not really over what an arbitration clause provides; rather, it is a dispute over the interpretation of other clauses of the collective bargaining agreement, e.g., termination clauses, or . . . an 'evergreen clause.' . . . Where the agreement contains a sweeping arbitration clause covering all disputes involving the meaning of terms and provisions of the agreement and where the arbitration clause does not expressly exclude disputes over the termination provision or the 'evergreen' clause, disputes over these matters should be submitted to arbitration.

*Id.* (internal citations omitted). If the situation falls into the latter category—whether an arbitration agreement has expired—so long as there is a "broad arbitration clause" and "at least [ ] a colorable claim under the contract that the contract has not terminated," then the issue of termination is for the arbitrator. *Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 886 (2d Cir. 1982).

5

### 1. A-Agreement and First MES Agreement

The Association terminated PAC's membership on August 29, 2012. At that time, two of the three Agreements at issue were already in effect—the A-Agreement (which came into effect on July 1, 2012) and the first MES Agreement (which was in effect from October 1, 2010 through September 30, 2013).[1] Therefore, as to these two Agreements, there is no question that the parties entered into an Agreement to arbitrate. The only issue is whether the termination from the Association also terminated PAC's obligations under the Agreements.[2] As long as there is a broad arbitration clause and a colorable claim that the Agreements were not terminated, then the issue of termination is for the arbitrator.

The arbitration clauses in these two Agreements state, "All disputes and controversies arising out of and under this Agreement or related thereto shall be settled by arbitration." *See* Pet. Ex. A at 67; Pet. Ex. B-1 at 24. By comparison, the arbitration clause in *Ottley*, which the court found to be broad, stated:

> All complaints, disputes, controversies or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this agreement, or any acts, conduct or relations between any of the parties hereto and/or between the Union and any Employer, directly or indirectly, which shall not have been adjusted by and between those involved shall be submitted to the Impartial

---

[1] I reject PAC's argument that, as of August 29, 2012, it was not bound by the A-Agreement that went into effect on July 1, 2012. PAC was still a member of the Association on July 1, 2012 when the A-Agreement went into effect. PAC's arguments that it was suspended from the Association only 30 days after the A-Agreement went into effect and terminated from the Association only 8 weeks after it went into effect is irrelevant. There can be no dispute that, as of August 29, 2012, PAC was bound to the A-Agreement and its arbitration clause. The only issue is whether its termination from the Association relieved it of its obligations under the A-Agreement.

[2] PAC argues that the court's analysis should be affected by the fact that it was terminated from the Association rather than voluntarily withdrawing. However, "this is a distinction without a difference . . . [and] has no bearing on the applicability of the notification requirements." *Trustee of Plumbers Local Union No. 1 Welfare Fund v. Bass Plumbing & Heating Corp.*, 2014 WL 6886107, at *4 (E.D.N.Y. Dec. 8, 2014).

Chairman hereinafter mentioned for arbitration and his decision shall be final and binding upon the parties hereto.

The arbitration clauses at issue here are at least as broad, if not broader, than what was at issue in *Ottley*, especially when one considers the "or related to" language present here, which was absent in *Ottley*. Moreover, the arbitration clauses do not exclude issues relating to termination. As *Landau* noted, the dispute here is not about what the arbitration clause provides; "rather, it is a dispute over the interpretation of other clauses of the collective bargaining agreement, e.g. termination clauses." *Landau*, 123 F.3d at 72-73.

In addition to these broad arbitration clauses, there is also at least a colorable claim that the Agreements did not terminate on August 29, 2012. The Agreements had very clear abrogation procedures. They stated, "Any entity wishing to abrogate this Agreement must notify both the Association and the Union in writing . . . a minimum of one hundred and eighty (180) days prior to the expiration of this Agreement." *See* Pet. Ex. A at 73; Pet. Ex. B-1 at 30. It is undisputed that PAC did not seek to abrogate until December 31, 2014. This provides at least a colorable claim that the contract had not terminated. Accordingly, the issue of whether PAC's termination from the Association also terminated its obligations under these two Agreements was an issue for the arbitration committee. *See Steelmasters, Inc. v. Local Union 580 of Int'l Ass'n of Bridge, Structural Ornamental & Reinforcing Iron Workers, AFL-CIO*, 2008 WL 312096, at *6 (E.D.N.Y. Feb. 1, 2008); *Cleveland Wrecking Co. v. Iron Workers Local Union 40*, 947 F. Supp. 745, 748-49 (S.D.N.Y. 1996), *aff'd, criticized on other grounds*, 136 F.3d 884 (2d Cir. 1997).

### 2.     Second MES Agreement

The second MES Agreement is in a different posture than the two Agreements discussed above. It went into effect on October 1, 2013, more than a year after respondent was terminated from the Association on August 29, 2012. Therefore, unlike the other two Agreements, respondent

was not already a signatory to the second MES Agreement upon its termination from the Association.

Like the other two Agreements, the second MES Agreement had a broad arbitration clause. It states, "All disputes and controversies arising out of and under this Agreement or related thereto shall be settled by arbitration." Pet. Ex. B-2 at 24. Accordingly, so long as there is a colorable claim that PAC's obligations under the second MES Agreement did not terminate, then this was an issue for the arbitration committee to decide.

"[T]he Second Circuit has held that an entity does not have to sign a CBA to be bound by its terms, and a party can adopt the terms of the relevant CBA through its actions." *Trustees of Sheet Metal Workers Int'l Ass'n Local No. 38 Vacation Fund v. Katonah Roofing, Inc.*, 2011 WL 9010113, at *4 (S.D.N.Y. Sept. 4, 2011) (citing *Brown v. C. Volante Corp.*, 194 F.3d 351, 355-56 (2d Cir. 1999)). For actions to bind an employer to a CBA, they must demonstrate an unequivocal intention to be bound. *Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Construction Servs. Corp.*, 2015 WL 1443038, at *5 (E.D.N.Y. Mar. 27, 2015).

It is undisputed that respondent continued to pay fringe benefits on behalf of one employee pursuant to the MES Agreement through 2014 (at which time the second MES Agreement had gone into effect and more than 16[3] months after respondent was terminated from the Association).[4]

---

[3] I use the figure of 16 months because the arbitration award states that respondent continued to submit fringe benefit contributions "throughout 2014." Because of this imprecision, it is impossible to know when (if at all) respondent ceased making these payments in 2014. Giving respondent every benefit of the doubt, even if I assume it stopped making these payments in January of 2014, this still amounts to it making fringe benefit contributions for 16 months after its termination. I do note, though, that the more likely interpretation of the arbitration award's language of "throughout 2014" is that respondent's payments continued well past January of 2014.

[4] By contrast, in *Lanzfame v. Dana Restoration, Inc.*, 2011 WL 1100111, at * 3 (E.D.N.Y. Mar. 22, 2011), the court concluded that continuing to comply with the terms of the CBA for

Respondent attempts to minimize this action by highlighting that it was only one employee for whom it paid fringe benefits, but, as respondent itself states, it had only one employee subject to the MES Agreement. *See* Campione Decl. at ¶ 7. Besides minimizing these contributions, respondent does not attempt to otherwise explain them other than to say that the fringe benefits were contributed "purely as a courtesy" to this employee.[5] *Id.* at ¶ 5. PAC's payment of fringe benefits for at least 16 months after August 29, 2012 establishes a colorable claim that its obligations pursuant to the MES Agreements never terminated. *See C. Volante Corp.*, 194 F.3d at 355-56.

In addition to and independent of its conduct after August 29, 2012, the language of the first MES Agreement also provides a colorable claim that PAC's obligations pursuant to the MES Agreements did not terminate on August 29, 2012. As of August 29, 2012, PAC was a signatory to the first MES Agreement. It provided that, "One hundred and twenty (120) days prior to the expiration of this Agreement a conference of all Parties hereto shall be held for the purpose of

---

only two months after the expiration was insufficient to manifest a clear intent to be bound by the new agreement. Similarly, in *Steelmasters, Inc. v. Local Union 580 of Int'l Ass'n of Bridge, Structural Ornamental & Reinforcing Iron Workers, AFL-CIO*, 2008 WL 312096, at *7 (E.D.N.Y. Feb. 1, 2008), the court concluded that the employer submitting 16 weeks of fringe benefit remittance reports was insufficient to bind it to a CBA through its course of conduct because the conduct did not occur for a sufficiently long period of time.

[5] The cases respondent relies on to support its argument that these payments are insufficient to signify its intent to be bound are unavailing. *See Cuyahoga Wrecking Corp. v. Laborers Int'l Union of No. Am., Local Union No. 210*, 644 F. Supp. 878, 881 (W.D.N.Y. 1986) (conduct insufficient to manifest intent to be bound where employer was never a part of the association that negotiated the agreements, rather than having withdrawn or been terminated from the association); *Trustees of Int'l Brotherhood of Teamsters Local 531 Sick & Welfare Fund v. Marangi Bros.*, 289 F. Supp. 2d 455, 465 (S.D.N.Y. 2003) (after agreement expired, employer continued to make payments despite the fact that no subsequent agreement was ever drafted, in which case the court concluded an employer's conduct could not bind it to a nonexistent agreement).

consummating a new Agreement." Pet. Ex. B-1 at 29. Undoubtedly, this is why the arbitration committee found that signatories of the first MES Agreement would be bound by the second MES Agreement (as it would be executed while the first MES Agreement was still in effect) unless a party provided notice of its desire to abrogate. PAC never provided such notice. This also provides a colorable claim that PAC's obligations under the MES Agreements did not terminate.

In light of the broad arbitration clause and colorable claim that its obligations under the second MES Agreement did not terminate, the issue of whether PAC's termination from the Association also relieved it of its obligations pursuant to the second MES Agreement was an issue for the arbitration committee.

### D. Arbitration Committee's Decision and Award

In evaluating whether a labor arbitration decision should be confirmed, a court's "task is simply to ensure that the arbitrator was even arguably construing or applying the contract and acting within the scope of his authority and did not ignore the plain language of the contract . . . As long as the award draws it essence from the collective bargaining agreement and is not merely the arbitrator's own brand of industrial justice, it must be confirmed." *National Football League Mgmt. Council v. National Football League Players Ass'n*, 820 F.3d 527, 537 (2d Cir. 2016). As to factual issues, as long as "no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding, does not provide a basis for a reviewing court to refuse to enforce the award." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001).

The arbitration committee determined that PAC was bound to all three Agreements. As to the A-Agreement and first MES Agreement, it concluded that PAC "had given its bargaining rights to the [Association] which entered into the CBAs . . . [and there was] no request to abrogate from PAC . . . until December 31, 2014, well after the alleged infractions of the CBAs." Decision at 3.

As to the Second MES Agreement, it found PAC to be bound because "it never requested to abrogate from the previous agreement . . . 180 days prior to expiration . . . Furthermore, PAC throughout 2014 continued to submit Union fringe[] [benefits] on at least one of its employees which we find evidences its intent and obligation to remain a signatory contractor." *Id.*

In reviewing the committee's decision, my task is only to ensure that it did not ignore the plain language of the contract and that the award drew its essence from the Agreements. PAC first argues that the award should not be confirmed and should be vacated because it was not bound by the Agreements after August 29, 2012. I disagree. The committee was operating within the scope of its authority when it interpreted the termination provisions of the three Agreements. As noted above, the arbitration clause was broad and encompassed issues related to termination. These termination provisions were also clear—PAC had to provide notice to abrogate the Agreements, which it did not do. The committee did not ignore the plain language of the contract. To the contrary, it followed it. The contract required notice to abrogate, which PAC did not provide. The committee's decision is only reinforced by PAC's conduct after August 29, 2012 evidencing its intent to be bound. As discussed above, the committee's decision regarding this conduct finds strong support in law.

Respondent next argues that the arbitration committee awarded penalties based on conduct outside of the Agreements' two year look-back period. The Agreements provide for liability for actions that occurred two years immediately preceding the filing of the complaint. Given petitioner filed its complaint and request for arbitration on December 16, 2014, respondent argues that the arbitration award can be based only on actions it took between December 16, 2012 and December 16, 2014 (the "liability period"). Respondent's position is that it was not a signatory to any Agreements during that time, thus making it impossible for it to have committed a violation during

that period. Based on my conclusions above that respondent was bound by all three Agreements, this argument is meritless. The A-Agreement was in effect from July 1, 2012 to June 30, 2016. Therefore, the liability period of December 16, 2012 to December 16, 2014 falls within the term of the A-Agreement. The first MES Agreement was in effect from October 1, 2010 to September 30, 2013. Accordingly, any violation from December 16, 2012 to September 30, 2013 (when the first MES Agreement expired) can give rise to liability. The second MES Agreement was in effect from October 1, 2013 to September 30, 2016. Any violation from October 1, 2013 to December 16, 2014 can similarly give rise to liability.

Even if a court's review of an arbitrator's factual findings was not limited, the Decision shows that for all five of the alleged violations, the actions occurred within the liability period. The Decision demonstrates that respondent: (1) had no bond during the liability period; (2) did not request green cards for jobs done in 2014; (3) employed non-union laborers in 2014; (4) used an improper ratio of journeymen to helpers in 2014; and (5) did not pay fringe benefits for workers for a period that included August of 2013.[6] All of these violations fall within the liability period of December 16, 2012 to December 16, 2014, thus complying with the two year look-back provision in the CBAs.[7] Accordingly, I reject respondent's argument that the arbitration award violated the two year look-back provision of the Agreements.

---

[6] As to the fourth claim, the use of an improper ratio of journeymen to helpers, the arbitration committee dismissed this claim.

[7] As to the bond, the Agreements required the employer to furnish a bond to guarantee fringe benefit payments. According to the arbitration committee's decision and award, it relied on evidence that, as of January 5, 2015, which is outside the liability period as it comes after December 16, 2014, PAC had no bond. I interpret this as providing the most up to date status regarding the bond—that respondent still, as during the liability period, did not have one. I do not interpret it to mean that respondent had a bond during the relevant liability period, but then dropped the bond at some point after December 16, 2014. Respondent does not argue otherwise.

Respondent provides no other grounds to support its position that the arbitration award should not be confirmed. Notably, respondent does not dispute that the Agreements required it to do the four things the arbitration committee determined it failed to do. Accordingly, because the arbitration committee acted within the scope of its authority and did not ignore the plain language of the contract, I conclude that the arbitration award should be confirmed and respondent's motion to vacate the award should be denied.[8]

### E. Pre-Judgment Interest

"New York law provides for prejudgment interest running from the date of an arbitration award until the entry of final judgment." *Local 2006, Retail, Wholesale & Dept. Store Union, United Food & Comm. Workers v. Basic Wear, Inc.*, 2016 WL 7469621, at *3 (S.D.N.Y. Dec. 28, 2016) (internal quotation omitted). Petitioner seeks prejudgment interest in the amount of 9% from the date of the award through the date of judgment. Though respondent generally opposes confirming the award, as discussed above, it does not address pre-judgment interest. Given the presumption in favor of pre-judgment interest and respondent's failure to oppose such an award, I grant petitioner's request. *See In re Arbitration Between Westchester Fire Ins. Co. v. Massamont Ins. Agency, Inc.*, 420 F. Supp. 2d 223, 226 (S.D.N.Y. 2005) (citing *In re Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd.*, 737 F.2d 150, 153-54 (2d Cir. 1984)). "The common

---

[8] I also note that respondent's motion to vacate is untimely. Contrary to respondent's argument, it is irrelevant that its motion was made pursuant to a court ordered briefing schedule. Respondent had ninety days from the date of the award to move to vacate it. *See Local 802, Assoc. Musicians of Greater New York v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998). The arbitration award was delivered on February 6, 2015. Therefore, respondent had until May 6, 2015 to move to vacate it. The petition in this case was not filed until February 2, 2016, which is within the one-year period a party has to confirm an award. Accordingly, there is no schedule the court could have set that would have made PAC's motion timely. Instead, if PAC wanted to vacate the award, it had to have filed its own action prior to May 6, 2015.

practice among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law." *Basic Wear*, 2016 WL 7469621, at *3 (S.D.N.Y. Dec. 28, 2016) (quoting *N.Y. City Dist. Council of Carpenters v. Metro Furniture Servs. LLC*, 2012 WL 4492384, at *3 (S.D.N.Y. Sept. 28, 2012)). *See* N.Y. C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."). Accordingly, petitioner is entitled to pre-judgment interest from the date of the award to the date of judgment in the amount of 9% per annum.

## III. Conclusion

Petitioner's motion for summary judgment to confirm the award is granted and respondent's motion to vacate the award is denied. Further, petitioner is awarded pre-judgment interest in the amount of 9% per annum from the date of the award to the date of judgment. The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED.**

/s/ *Nina Gershon*
**NINA GERSHON**
**United States District Judge**

Dated: March 23, 2017
Brooklyn, New York